8 F.3d 966
 62 USLW 2261
 SALOMON FOREX, INCORPORATED, Plaintiff-Appellee,
v.
Laszlo N. TAUBER, M.D., Defendant and Third Party Plaintiff-Appellant,
and
Laszlo N. TAUBER, M.D. and Associates, Defendant,
v.
SALOMON BROTHERS, INCORPORATED; Salomon, Incorporated;
Fred Gatling, Third Party Defendants-Appellees,
and
Paul Mozer, Third Party Defendant.
The Board of Trade of the City of Chicago; Chicago
Mercantile Exchange; United States of America; Futures
Industry Association, Incorporated; Managed Futures
Association; Foreign Exchange Committee; Commodity Futures
Trading Commission; State of Idaho, Department of Finance;
Nevada Securities Division of the Office of the Secretary of
State, Amici Curiae.
 No. 92-1406.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1993.
Decided Oct. 18, 1993.
 
 Joel I. Klein, Klein, Farr, Smith & Taranto, Washington, DC, argued (Richard G. Taranto, on brief), for defendant and third party plaintiff-appellant.
 Eugene D. Gulland, Covington & Burling, Washington, DC, argued (William D. Iverson, Marc S. Mayerson, Eric G. Lasker, Covington & Burling, Washington, DC, Edward J. Rosen, Cleary, Gottlieb, Steen & Hamilton, New York City, on brief), for plaintiff-appellee.
 Mark D. Young, John H. Stassen, Maureen A. Donley-Hoopes, Kirkland & Ellis, Washington, DC, Jerrold E. Salzman, Freeman, Freeman & Salzman, Chicago, Illinois, for Amici Curiae Chicago Bd. of Trade and Chicago Mercantile Exchange.
 Joanne T. Medero, Gen. Counsel, Jay L. Witkin, Deputy Gen. Counsel, Pat G. Nicolette, Deputy Gen. Counsel, David R. Merrill, Deputy Gen. Counsel, Gracemary Rizzo, Commodity Futures Trading Com'n, Washington, DC, for amicus curiae, CFTC, on brief.
 David S. Mitchell, David F. Williams, Ralph Berman, Cadwalader, Wickersham & Taft, New York City, for amici curiae, Futures Industry Ass'n and Managed Futures Ass'n, on brief.
 David B. Tulchin, David M. Huggin, Richard H. Klapper, Kenneth M. Raisler, Sullivan & Cromwell, New York City, for amicus curiae, Foreign Exchange Committee, on brief.
 Stuart M. Gerson, Asst. Atty. Gen., Richard Cullen, U.S. Atty., Barbara C. Biddle, Edward R. Cohen, Civ. Div., U.S. Dept. of Justice, Washington, DC, for amicus curiae, U.S., Wayne Klein, Sp. Deputy Atty. Gen./Securities Bureau Chief, State of Idaho, Boise, ID, for amici curiae, State of Idaho and Nevada Securities Div., on brief.
 Before PHILLIPS, NIEMEYER, and WILLIAMS, Circuit Judges.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 This appeal, taken from the district court's enforcement of a trading debt, squarely presents the issue of whether professional traders may individually negotiate sales of foreign currency futures and options off organized exchanges without violating the Commodities Exchange Act, 7 U.S.C. § 1, et seq. Finding that the Act is inapplicable to such trading and that there are no other defenses to enforcement of the debt in question, we affirm the judgment of the district court.
 
 
 2
 * Over the course of 2- 1/2 years Dr. Laszlo N. Tauber, a surgeon from northern Virginia, entered into 2,702 transactions with Salomon Forex, Inc. and related entities, each transaction involving the sale of foreign currency futures[1] and options. Tauber's trading with Salomon Forex was just one aspect of his dealings in foreign currency, which were on a large scale. During the relevant period, Tauber traded with more than a dozen other companies besides Salomon Forex, exchanging billions of dollars worth of currency. He compared prices from various sources and bought currency at the most advantageous rate, often using one transaction to cover the risks of another. Tauber individually negotiated terms for these currency transactions, both with Salomon Forex and with other companies.
 
 
 3
 Tauber's wholly-owned foreign currency trading company, Westwood Options, Inc., holds a seat on the nation's largest foreign currency exchange, the Philadelphia Stock Exchange. Tauber himself is worth, by the estimate of the district court, over half a billion dollars, and he owns extensive real estate holdings as well as foreign currency investments. Tauber maintains foreign bank accounts which he uses to carry out foreign currency transactions and uses foreign currency mortgages in connection with his real estate ventures. While Tauber was trading with Salomon Forex, Salomon Forex did not conduct trading of this type with any other individual investor--all of Salomon Forex's other foreign currency investment clients were institutions. The district court found that Tauber is a "sophisticated foreign currency trader."
 
 
 4
 Tauber's dealings with Salomon Forex involved foreign currency solely as an investment; they were not aimed at the acquisition of actual foreign currency. Rather than take physical delivery of the actual currency he purchased from Salomon Forex, Tauber typically entered into counterbalancing transactions with Salomon Forex by the time the contract matured. Initially, Salomon Forex's staff would contact Tauber's staff to inquire as to where currency was to be delivered when a contract matured. Salomon Forex later began placing the legend "Always Nets to Zero" on the written confirmation notices for Tauber's transactions. Only four of the Tauber-Salomon Forex contracts resulted in delivery of actual currency.
 
 
 5
 In March 1991, Tauber's investments, particularly in Swiss francs, declined sharply in value and Salomon Forex demanded that Tauber cover his open positions. When Tauber failed to do so, Salomon Forex ceased trading with him. Just over $25 million became due and payable under 68 futures contracts that matured in July and August 1991, leaving Tauber with a total outstanding account balance of $30 million owing to Salomon Forex. After applying $4 million in collateral that it was holding to this balance, Salomon Forex billed Tauber for almost $26 million. When Tauber refused to pay, Salomon Forex brought this suit. Tauber responded with numerous defenses, contending that the transactions he negotiated with Salomon Forex were illegal under the Commodities Exchange Act and that therefore he should not be held responsible for them. Tauber also argued that his contracts are void as violating New York state law. With his answer, Tauber filed counterclaims for negligence and for breach of contract. On Salomon Forex's motion for summary judgment, the district court entered judgment in favor of Salomon Forex, finding that Tauber had not met his burden of presenting evidence that he had any viable counterclaim or defense to his debt. 795 F.Supp. 768. This appeal followed.
 
 II
 
 6
 The central issue in this case is whether Congress intended transactions such as those between Salomon Forex and Tauber to be regulated by the Commodities Exchange Act ("CEA"). In order to resolve this issue, it is first necessary to understand the history and purpose of that Act.
 
 
 7
 Congress enacted the Futures Trading Act, Pub.L. No. 67-66, 42 Stat. 187, in 1921 to regulate boards of trade on which futures trading occurred, primarily to prevent price manipulation and what many perceived as excessive speculation in grains. See William L. Stein, The Exchange-Trading Requirement of the Commodity Exchange Act, 41 Vand.L.Rev. 473, 477 & n. 23 (1988) (collecting relevant legislative history). The Act also sought to eliminate "bucket shops," businesses that offered small investors the opportunity to speculate, and indeed even wager, on the price of commodities through unreported deals. While a bucket shop typically attempted to match a customer order exposing the shop to the risk of upward price movement with an order exposing it to the risk of a downward movement, it nevertheless purported to assume the risk of any net positions. When, however, the market prices moved adversely to the bucket shop's net position, it usually closed, leaving behind uncollectible debts.
 
 
 8
 One year after its passage, the Futures Trading Act was declared unconstitutional as an improper exercise of the taxing power. See Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922). Congress swiftly responded with the Grain Futures Act of 1922, Pub.L. No. 67-331, 42 Stat. 998, which derived its authority from the broad powers granted by the Commerce Clause. Numerous changes and amendments followed over the years, and the statutory framework established by the Grain Futures Act gradually developed into the Commodities Exchange Act in its present form. See 7 U.S.C. §§ 1-25.
 
 
 9
 Today the CEA establishes a comprehensive system for regulating futures contracts and options. It provides at its core that no person shall enter into, or offer to enter into, a transaction involving the sale of a "commodity for future delivery," unless it is conducted on or through a board of trade designated and regulated by the Commodity Futures Trading Commission ("CFTC") as an exchange ("contract market"). See 7 U.S.C. §§ 2, 6. The Act also regulates transactions of the character of an option. See 7 U.S.C. § 6c.
 
 
 10
 Because the Act was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate "spot" transactions (transactions for the immediate sale and delivery of a commodity) or "cash forward" transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred). Thus § 2(a)(1)(A) of the Act, 7 U.S.C. § 2, provides that "futures" regulated by the Act do not include transactions involving actual physical delivery of the commodity, even on a deferred basis. Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity "for future delivery" but excluded transactions involving "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2. The distinction, though semantically subtle, is what the trade refers to as the difference between "futures," which generally are regulated, and "cash forwards" or "forwards," which are not. See generally David J. Gilberg, Regulation of New Financial Instruments under the Federal Securities and Commodities Laws, 39 Vand.L.Rev. 1599, 1603-08 (1986) (discussing distinction between futures and forwards); Lewis D. Solomon & Howard B. Dicker, The Crash of 1987: A Legal and Public Policy Analysis, 57 Fordham L.Rev. 191, 193-96 (1988) (describing evolution of forwards and futures); Stein, supra, at 486-92 (detailing legislative history of forward/future distinction); Mark D. Young & William L. Stein, Swap Transactions under the Commodity Exchange Act: Is Congressional Action Needed?, 76 Geo.L.J. 1917, 1923-24 (1988) (describing distinction between forwards and futures).
 
 
 11
 A "futures contract," or "future," never precisely defined by statute, nevertheless has an accepted meaning which brings it within the scope of transactions historically sought to be regulated by the CEA.
 
 
 12
 It is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators).[2] Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.
 
 
 13
 In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods.
 
 
 14
 This case also involves a third type of instrument, options or option contracts, which are defined by traditional contract principles. Unlike futures and cash forwards which create mutually binding obligations, the option holder incurs no obligation, but rather pays a fee or other consideration for obtaining the enforceable obligation of the option giver to sell or buy upon demand. Thus, the total risk assumed in purchasing an option is the loss of the fee. A commodity option confers on its holder the right, but not the obligation, to buy (a "call option") or to sell (a "put option") a specific amount of a commodity at a fixed price by a date certain.
 
 
 15
 The present controversy centers on the 1974 amendments to the CEA, in which Congress greatly expanded the scope of the Act's regulation. Act of Oct. 23, 1974, 88 Stat. 1389 (codified as amended at 7 U.S.C. §§ 1-25). The definition of "commodity" was substantially broadened to include, in addition to specified agricultural products, "all other goods and articles ... and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in," except for specific items not relevant to the present discussion. See 7 U.S.C. § 1a. Because the CEA uses the term "commodity" in setting the jurisdiction of the CFTC, that agency's jurisdiction under the Act was greatly expanded by this redefinition. See 7 U.S.C. § 2.
 
 
 16
 The General Counsel of the Department of the Treasury, in response to the prospect of this proposed expansion of the definition of "commodity," wrote a letter to the Senate Committee on Agriculture and Forestry on behalf of the Department. In this letter he proposed explicit recognition of an exception to CEA coverage which he assumed Congress to have implicitly intended, that off-exchange trading of foreign exchange futures was not to be regulated under the CEA. This letter stated, in pertinent part:
 
 
 17
 The Department believes the bills contain an ambiguity that should be clarified. The provisions of the bills do not clearly indicate that the new regulatory agency's authority would be limited to the regulation of futures trading on organized exchanges, and would not extend to futures trading in foreign currencies off organized exchanges. We do not believe that either the House of Representatives or your Committee intends the proposed legislation to subject the foreign currency futures trading of banks or other institutions, other than on an organized exchange, to the new regulatory regime.
 
 
 18
 The Department feels strongly that foreign exchange futures trading, other than on organized exchanges, should not be regulated by the new agency. Virtually all futures trading in foreign currencies in the United States is carried out through an informal network of banks and dealers. This dealer market, which consists primarily of the large banks, has proved highly efficient in serving the needs of international business in hedging the risks that stem from foreign exchange rate movements. The participants in this market are sophisticated and informed institutions, unlike the participants on organized exchanges, which, in some cases, include individuals and small traders who may need to be protected by some form of governmental regulation.
 
 
 19
 Where the need for regulation of transactions on other than organized exchanges does exist, this should be done through strengthening existing regulatory responsibilities now lodged in the Comptroller of the Currency and the Federal Reserve. These agencies are currently taking action to achieve closer supervision of the trading risks involved in these activities. The Commodity Futures Trading Commission would clearly not have the expertise to regulate a complex banking function and would confuse an already highly regulated business sector. Moreover, in this context, new regulatory limitations and restrictions could have an adverse impact on the usefulness and efficiency of foreign exchange markets for traders and investors.
 
 
 20
 S.Rep. No. 1131, 93d Cong., 2d Sess. 49-51 (1974), reprinted in 1974 U.S.C.C.A.N. 5843, 5887-89.[3]
 
 
 21
 To establish the recommended exclusion, the Treasury Department proposed an amendment, which was adopted almost verbatim and ultimately codified at 7 U.S.C. § 2:
 
 
 22
 Nothing in this chapter [7 U.S.C. § 1, et seq.] shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, unless such transactions involve the sale thereof for future delivery conducted on a board of trade.
 
 
 23
 7 U.S.C. § 2.[4] It is this language, known as the Treasury Amendment, which Salomon Forex contends exempts the transactions between it and Tauber from regulation by the CEA.
 
 III
 
 24
 Tauber's principal defense rests on the ground that his transactions with Salomon Forex are unenforceable because they violate the CEA. Tauber claims that the CEA requires that foreign currency futures be traded exclusively on exchanges designated by the CFTC and that options be traded either on such exchanges or on securities exchanges designated by the Securities Exchange Commission. 7 U.S.C. §§ 6, 6c(b), 6c(f). Resting on the Act's broad definition of commodity, see 7 U.S.C. § 2, which all parties concede includes foreign currency, and the requirement that transactions involving the purchase or sale of a commodity for future delivery must be conducted on a regulated exchange, Tauber argues that these transactions are illegal "because the foreign currency futures transactions at issue in this case took place off any exchange."[5] (Emphasis added).
 
 
 25
 In response to the district court's conclusion that Tauber's transactions were exempted from CEA regulation by the Treasury Amendment, which exempts from regulation all off-exchange "transactions in foreign currency," Tauber argues that the exemption applies only to "transactions in the actual commodity." The purchase or sale of options or futures is not, he maintains, "in that natural sense, a transaction in the commodity itself." He contends that the Treasury Amendment was intended only to exempt from regulation "spot" transactions (involving the immediate sale and conveyance of a commodity) and "cash forward" transactions (involving a present sale with deferred delivery), neither of which, he argues, describes his transactions with Salomon Forex.
 
 
 26
 Tauber contends that his interpretation of the Treasury Amendment is supported by Board of Trade v. Securities Exchange Commission, 677 F.2d 1137 (7th Cir.1982), vacated as moot, 459 U.S. 1026, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982). Although he recognizes that the decision was vacated as moot because of a subsequently adopted amendment to the Act, Tauber argues that the holding is still authoritative on construction of the CEA. Two other cases relied upon by Tauber are Chicago Mercantile Exchange v. Securities Exchange Commission, 883 F.2d 537, 544 (7th Cir.1989), cert. denied, 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990), and CFTC v. American Board of Trade, Inc., 803 F.2d 1242 (2d Cir.1986). At bottom, Tauber contends that these cases distinguish the statutory language of the Treasury Amendment, "transactions in," from "transactions involving " foreign currency, assigning the former phrase only to transactions in which physical delivery of the commodity itself is anticipated. Tauber's position is supported by the Commodities Futures Trading Commission, which submitted a brief as an amicus curiae. See also SEC-CFTC Jurisdictional Correspondence [1975-1977 transfer binder] Comm.Fut.L.Rep. (CCH) p 20,117, at 20, 831-41 (CFTC Staff Response Dec. 3, 1975).
 
 
 27
 Tauber also points to portions of the legislative history that show that Congress intended to exempt only transactions conducted among members of an international network of banks and dealers which trade in foreign currencies. See, e.g., H.R.Conf.Rep. No. 1383, 93d Cong. 2d Sess. 35 (1974); S.Rep. No. 1131, supra at 6, 23, 31, U.S.Code Cong. & Admin.News 1974, 5843. He contends that in all of the explanations about the Act contained in the legislative history, no reference is found which suggests that futures and options involving foreign currency were being exempted from regulation. Finally, Tauber argues that if the Treasury Amendment is construed to apply to futures, it applies only to banks and financial institutions that engage in such transactions among themselves.
 
 
 28
 Salomon Forex characterizes this case as a standard breach of contract action involving privately negotiated futures and options contracts of the kind entered into daily by foreign currency dealers and banks. Contracts of this kind are routinely the basis for trading in foreign currencies and are, it contends, exempt from CEA regulation by reason of the Treasury Amendment adopted in 1974 pursuant to the Treasury Department's proposal. Salomon Forex argues that the Treasury Amendment is a broadly-worded exemption, bringing within its scope all types of "off-exchange" arrangements for dealing in foreign currencies, including futures and options contracts. Arguing from the plain meaning of the Amendment and using other statutory interpretation tools, Salomon Forex asserts that Congress intended to leave unregulated all transactions conducted off exchanges "in which foreign currency is the actual subject matter." As does Tauber, Salomon Forex relies on the legislative history and agency interpretation to support its position.
 
 
 29
 We are thus presented with the question of whether the individually negotiated, off-exchange futures and options contracts between Salomon Forex and Tauber involving foreign currencies are regulated by the CEA.
 
 
 30
 The amici curiae argue, for various reasons, that the answer to this question will have far-reaching effects. The Commodity Futures Trading Commission states that an interpretation which leaves these transactions unregulated frustrates the regulatory scheme developed by Congress over a period of 70 years "to secure the economic benefits of price discovery while protecting against the evils of price manipulation, excessive speculation, and boiler rooms which harm commerce and the public." Such an interpretation, the CFTC argues, would permit any individual to participate in futures contracts involving foreign currency, and "bucket shops and boiler rooms, the very type of fraudulent businesses Congress sought to outlaw in enacting the CEA, would inevitably follow." The Board of Trade of the City of Chicago and Chicago Mercantile Exchange support the views of the Commission and add that such an interpretation would "threaten the commercial viability of the [commodity] exchanges." The State of Idaho, Department of Finance, and the Nevada Securities Division of the Office of the Secretary of State argue that if we adopt the interpretation advanced by Salomon Forex, the regulation of transactions of the kind here involved would probably be subject to regulation by the Securities Exchange Commission, a result not intended by Congress.
 
 
 31
 The United States in its amicus curiae brief urges that if we interpret the CEA to regulate the traditionally unregulated markets, market efficiency would be reduced and innovation in the development of new mechanisms would be inhibited, all with the tendency to increase the cost of financing government debt. The Securities Exchange Commission joins in the position of the United States. The Foreign Exchange Committee, which includes representatives of major domestic and foreign commercial and investment banks and foreign currency brokers, contends with great alarm that regulation of the United States portion of the foreign currency markets "would result in extra-ordinary costs and would damage the United States' ability to compete as a world financial center." They contend that regulation would adversely affect the large and developing global market in foreign currency forwards and options in which the 1989 average daily turnover approximated $50 billion. The Futures Industry Association, Inc. and the Managed Futures Association contend similarly that regulation of off-exchange transactions in foreign currencies "poses a potential threat to the continuing, smooth functioning" of the market.
 
 IV
 
 32
 Interpretations of the Treasury Amendment have varied with the role of the interpreter. The Commodity Futures Trading Commission, pressing for greater regulation of transactions in foreign currencies, contends that the Treasury Amendment's exemption is intended to be narrowly tailored to exclude only spot and cash forward transactions, leaving all other futures and options to be regulated by the broad inclusive regulatory language of the Act. Foreign currency traders and the United States contend that off-exchange trades must not be burdened by regulation, and the plain meaning of the Treasury Amendment expressly so provides. At bottom, however, we are left solely with the task of determining what Congress intended.
 
 
 33
 The analysis begins, as with the interpretation of any legislative enactment, with the language of the Act, and if that conclusively reveals Congress' intent, the analysis ends. In arriving at the plain meaning, we apply long recognized principles of interpretation. We assume that the legislature used words that meant what it intended; that all words had a purpose and were meant to be read consistently; and that the statute's true meaning provides a rational response to the relevant situation. Conversely, we presume that language added by amendment was not mere surplusage; that undefined terms mean no more than the language imports; and that a statute is not self-contradictory or otherwise irrational. The interpretive process is thus a holistic endeavor to derive intent from statutory language and structures.
 
 
 34
 Turning to the language at issue, the CEA excludes from its regulation "transactions in foreign currency" unless they involve sales "for future delivery conducted on a board of trade." 7 U.S.C. § 2. We must decide whether "transactions in foreign currency" includes futures and options of the type traded in by Salomon Forex and Tauber. The phrase "transactions in foreign currency" is broad and unqualified. Its breadth is confirmed by the "unless" clause which removes from "transactions in foreign currency" those transactions which are "for future delivery conducted on a board of trade." If Congress meant for the clause "transactions in foreign currency" to apply only to transactions in the commodity itself, it would have no reason to exclude futures transactions conducted on an exchange. The class of transactions covered by the general clause "transactions in foreign currency" must include a larger class than those removed from it by the "unless" clause in order to give the latter clause meaning. Thus, because the clause "unless such transactions involve the sale thereof for future delivery conducted on a board of trade" refers to futures, the general clause "transactions in foreign currency" must also include futures. Under this analysis, we would have to construe the Treasury Amendment exempting transactions in foreign currency to reach beyond transactions in the commodity itself and to include all transactions in which foreign currency is the subject matter, including futures and options.
 
 
 35
 A similar analysis in a larger context leads to the same result. The CEA and its predecessor Acts dating back to 1921 have always regulated only futures and options and never spot transactions or cash forwards. From the beginning the CEA has excluded cash forward transactions with the following language: "the term 'future delivery,' as used in this chapter, shall not include any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2. Thus in 1974, when the Treasury Amendment was enacted, if Congress intended to limit the Amendment to spots and cash forwards in foreign currencies, as argued by Tauber, no amendment would have been necessary. All concede that these transactions were already excluded before the Treasury Amendment was adopted. The Treasury Amendment can only have meaning if it is interpreted to exclude something more than that which was already excluded before it was enacted.
 
 
 36
 In order to maintain that the clause "transactions in foreign currency" applies only to spots and cash forwards, as Tauber argues, we would also need to read in some qualifying language. While it is rational to argue that "transactions in foreign currency" is different from "transactions in contracts for foreign currency," when that distinction is applied to actual transactions, the reasoning falters. For instance, while transactions that involve contemporary delivery of the commodity might be a transaction "in" the commodity, why would a cash forward be analytically different from a future? Neither transaction involves contemporaneous delivery. Both transactions involve the purchase of a promise--a contract right--and only indirectly concern the underlying subject matter. Moreover, in practice, cash forwards are often offset by other transactions in a manner similar to the way futures are traded. See, Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. 39188, 39191-92 (Sept. 25, 1990).
 
 
 37
 Finally, the language of the Treasury Amendment excluding "transactions in" the subject goods is used elsewhere in the Act to mean all transactions involving the commodity. See, e.g., 7 U.S.C. § 5 ("Transactions in commodities involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest." (emphasis added)).
 
 
 38
 Once we conclude that the clause is to be read broadly to include futures, it is a short step to conclude that the Treasury Amendment applies to all transactions in which foreign currencies are the subject matter, including options. Since trading in both futures and options involves foreign currency, albeit indirectly, there is no principled reason to distinguish between them in this context.
 
 
 39
 We are thus satisfied that under the appropriate interpretation of the Treasury Amendment, all off-exchange transactions in foreign currency, including futures and options, are exempted from regulation by the CEA.
 
 
 40
 That Congress intended the Treasury Amendment be taken at its word is confirmed by the Amendment's legislative history. The uniformly expressed legislative intent behind the Treasury Amendment confirms that "transactions in foreign currency" are not limited to forwards. The concern that led to the adoption of the Treasury Amendment was that the informal network of established dealers in foreign currency-based investments would otherwise be brought within the ambit of the CEA. S.Rep. No. 1131 at 49-51, reprinted in 1974 U.S.C.C.A.N. at 5887-89. As the Senate report stated regarding the Agriculture and Forestry Committee's adoption of the Treasury Amendment:
 
 
 41
 [T]he Committee included an amendment to clarify that the provisions of the bill are not applicable to trading in foreign currency and certain enumerated financial instruments unless such trading is carried out on a formally organized futures exchange. A great deal of the trading in foreign currency in the United States is carried out through an informal network of banks and tellers.[6] The Committee believes that this market is more properly supervised by the bank regulatory agencies and that, therefore, regulation under this legislation is unnecessary.
 
 
 42
 Id. at 19, reprinted in 1974 U.S.C.C.A.N. at 5863. Moreover, it was clearly understood that this off-exchange network of banks and dealers engaged in the very type of futures transactions that are involved in this case. When the 1974 amendments to the CEA were first proposed, the Treasury Department wrote the appropriate Senate committee, "The Department feels strongly that foreign exchange futures trading, other than on organized exchanges, should not be regulated by the new agency" (emphasis added). It proposed an amendment to accomplish that wish which Congress adopted virtually verbatim (excluding from the proposed amendment only "puts and calls for securities" because they were covered by the securities laws). This Treasury request and direct congressional response is revealing.
 
 
 43
 To accept Tauber's reading of the Treasury Amendment would be to ignore the Amendment's plain meaning, legislative history, and context. It would also likely result in substantial market disruptions. The United States, advising this court as an amicus curiae, describes the significant disruption of the when-issued market for Treasury securities that would result if we were to adopt such an unnaturally restricted reading. The Foreign Exchange Committee in its amicus brief has also detailed the vast reach of the over-the-counter transactions which would be affected by an expansion of the CEA by this court.
 
 
 44
 We thus read the Treasury Amendment to apply to futures and options, and not solely to forwards. Tauber argues that such a reading is not fatal to his case, however, relying upon the alternative claim that even if some trading in foreign currency forwards and options is excluded, the exclusion applies only to trading carried out between banks. In making this argument, Tauber relies upon the references to protection of the "interbank market" found in the Treasury Amendment's legislative history, principally in the letter proposing the Amendment, and the references to bank regulation found in the Amendment's statutory history.
 
 
 45
 The Treasury letter does in fact refer to protection of the interbank market in foreign exchange futures. S.Rep. No. 1131, at 49-51, reprinted in 1974 U.S.C.C.A.N. at 5887-88. It notes, however, that this market is comprised of "an informal network of banks and dealers." Id. at 5887 (emphasis added). The Treasury Department's concern was that CFTC regulation would "have an adverse impact on the usefulness and efficiency of foreign exchange markets for traders and investors." Id. at 5888 (emphasis added). The Treasury Department, in proposing and drafting the Treasury Amendment, did not draw a distinction between banks and professional traders; it drew a distinction between the "informal network of banks and dealers" intended to be excluded and "the participants on organized exchanges." Id. The trading between Tauber and Salomon Forex clearly falls into the former, not the latter, category, leaving Tauber's argument that the Treasury Amendment is restricted to trading between banks unsupported by the Amendment's legislative history.
 
 
 46
 More important than the lack of historical support for Tauber's alternative position is the absence of any such distinction in the statutory text. The statute distinguishes only between on-exchange and off-exchange trading. Under the statutory scheme, it is the nature of the trade (whether a standardized trade within an organized market or an individually negotiated private deal), not the corporate form of the trader, that determines whether a trade is within the Act.
 
 
 47
 If the congressional goal underlying adoption of the Treasury Amendment was protection of the interbank market in foreign exchange forwards, this could have been accomplished easily by statutory language aimed at exempting only transactions in which both buyer and seller were banks. What the statute commands instead is the exemption of all trading off organized exchanges, including the entire informal professional trading network of which banks are a key part. As the trading between Salomon Forex and Tauber consisted of large-scale, customized, negotiated, bilateral transactions between sophisticated financial professionals, it falls within this classification and is not included within CEA coverage.
 
 
 48
 Tauber finally relies heavily on decisions of the Second and Seventh Circuits in defending his position, arguing that affirmance of the district court would result in a split among the circuits. The decisions to which Tauber cites do not conflict with the outcome we reach today, however, as both cases concerned on-exchange trading on behalf of the general public, not individual, large-scale deals between professionals.
 
 
 49
 In Commodity Futures Trading Comm'n v. American Bd. of Trade, Inc., 803 F.2d 1242 (2d Cir.1986), the Second Circuit upheld the closing of an exchange which the Commodity Futures Trading Commission had not approved. The defendant in that case, the American Board of Trade ("ABT"), acted as an exchange for options on various commodities, including foreign currency. The CFTC sued because the ABT was not properly registered, and the district court enjoined further trading and ordered recompense of all monetary losses suffered by customers. The ABT appealed, claiming, inter alia, that the Treasury Amendment excluded its transactions in options on foreign currency from CEA regulation. The Second Circuit affirmed the district court. Although the court, in dictum, seemed to indicate that no trading in foreign currency options or futures is excluded from CEA coverage because such trading is not trading "in" foreign currencies, at the same time it noted that such trading is excluded when carried out by sophisticated financial institutions. Id. at 1248-49. This inconsistency reveals that the key factor for the Second Circuit in deciding the case was not the subject matter of the deals--options and futures in foreign currency--but the identity of the parties--unsophisticated private individuals buying on an organized exchange.
 
 
 50
 The Seventh Circuit faced a similar situation in Board of Trade v. S.E.C., 677 F.2d 1137 (7th Cir.), vacated as moot 459 U.S. 1026, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982). In this case, the Securities and Exchange Commission had authorized a formally organized exchange trading in options on Government National Mortgage Association mortgage-backed pass through certificates (GNMA's or Ginnie Maes). The Seventh Circuit held that exchange trading of such instruments fell within the CEA and concluded that the CFTC, not the SEC, had authority over such trading. Again, no off-exchange trading was involved.
 
 
 51
 Tauber argues that affirmance of the district court will result in the use of this circuit as a base for marketing off-exchange futures contracts to the general public. In doing so he misapprehends the issue which this case presents. This case does not involve mass marketing to small investors, which would appear to require trading through an exchange, and our holding in no way implies that such marketing is exempt from the CEA. Cf. Commodity Futures Trading Commission v. Standard Forex, Inc., slip op. at p. 25 (E.D.N.Y.1993) (holding that Treasury Amendment excludes off-exchange transactions among banks already regulated and not transactions on a board of trade with "private unsophisticated investors"). The parties here agree that the transactions between Salomon Forex and Tauber were off-exchange transactions individually negotiated, and it is amply demonstrated that Tauber is a sophisticated investor. We hold only that individually-negotiated foreign currency option and futures transactions between sophisticated, large-scale foreign currency traders fall within the Treasury Amendment's exclusion from CEA coverage. They are "transactions in foreign currency ... [that do not] involve the sale thereof for future delivery conducted on a board of trade." Tauber was, thus, not engaged in trading on an unregulated exchange, but was rather engaged in off-exchange trading of the sort exempted from coverage of the CEA by the Treasury Amendment.
 
 V
 
 52
 Tauber argues that even if the CEA is not applicable, enforcement of his debt on summary judgment was inappropriate for other reasons. He contends that (1) his debt resulted from transactions violative of state law; (2) Salomon Forex was negligent in its handling of his account, resulting in a viable counterclaim; and (3) Salomon Forex breached an oral "best pricing" covenant in its dealings with him. We find these additional arguments to be without merit.
 
 
 53
 Tauber argues that the transactions he engaged in with Salomon Forex were illegal under New York's bucket shop statute, 23 N.Y.Gen.Bus.Law § 351, and that the resulting debt is therefore unenforceable. It is, however, an element of a violation of § 351 that the offending contract be made "without intending a bona fide purchase or sale" of the subject matter and with the intent to settle the account by reference to market quotations. The agreements between Salomon Forex and Tauber were bona fide contracts, resulting in legal obligations to take delivery. They were not settled by reference to the dealings of others, but by further trading between the parties, who engaged in offsetting transactions. The New York statute does not ban legally enforceable trades settled by further transactions, but only sham transactions. As the Supreme Court noted more than eight decades ago in finding that offsetting transactions did not render futures sales violative of the Illinois bucket shop law:
 
 
 54
 It seems to us an extraordinary and unlikely proposition that the dealings which give its character to the great market for futures sales in this country are to be regarded as mere wagers or as "pretended" buying or selling.... A set-off is in legal effect a delivery.
 
 
 55
 Board of Trade of the City of Chicago v. Christie Grain & Stock Co., 198 U.S. 236, 249, 25 S.Ct. 637, 639, 49 L.Ed. 1031 (1905).
 
 
 56
 Tauber also asserts a counterclaim for negligence on the part of Salomon Forex, but is unable to cite sufficient evidence to create a triable issue of fact on this matter. In particular, Tauber has presented no evidence of any damages from the negligence alleged. In agreeing to trade with Tauber, Salomon Forex required that Tauber post collateral to cover potential losses from sudden movements in currency markets. The amount of collateral required was keyed to Tauber's total exposure and was recalculated (by computer) as this fluctuated. In October 1989, Salomon announced that it had miscalculated Tauber's exposure to loss and that rather than having an excess of $15 million in collateral on deposit, Tauber had a deficit of $10 million. Tauber sent several letters to Salomon acknowledging that his exposure was now correctly calculated and promising to provide additional collateral. He expressly agreed to terms for providing this collateral, but failed to follow through on them.
 
 
 57
 Although Tauber did not cover this shortfall in collateral, the parties continued trading until March 1991, when Tauber's trading position became sharply negative as a result of a fall in the value of the Swiss franc, and Salomon Forex refused to continue trading without additional collateral. The only evidence offered linking Tauber's 1991 losses to the 1989 recalculation of required collateral is a single statement made at his deposition:
 
 
 58
 I protested [the change in collateral required], but I could not do anything because I was locked in that position and my argument was always from day one that if it would be an American option, then I understood it, but in a European option, you cannot exercise that option any other day than the day of expiration.
 
 
 59
 This uncorroborated and unelaborated allegation of damage is insufficient to bear Tauber's burden of coming forward with evidence of the existence of a factual controversy as to liability. It identifies no duty that was breached and ignored Tauber's contractual undertakings when engaging in these transactions.
 
 
 60
 Finally, Tauber claims to have been damaged by Salomon Forex's breach of an alleged oral agreement to provide him the "best price" on foreign currency options and futures. No evidence of the existence of such an agreement has been presented, leaving it without power to bar summary judgment. The sole support cited by Tauber as evidence of the existence of such an agreement is his own statement in an affidavit that:
 
 
 61
 In 1987, Geraldine McManus, then an employee of Salomon, solicited my foreign currency trading. She represented at that time that Salomon was a leader in the world capital markets, that it could offer the best pricing on foreign currency instruments, the best market information, and the best execution of foreign currency market trades.
 
 
 62
 Based upon this allegation, Tauber argues that he had reached an oral agreement with Salomon Forex that they would offer him only the best price and that this agreement was later breached. Accepting Tauber's statement as true, as we must in reviewing the grant against him of summary judgment, it still does not establish any such "best-pricing" agreement. Further, all trades between Salomon and Tauber were confirmed in writing, and the confirmations provided that any objection be made in writing within 10 days. Tauber signed and returned the majority of these confirmations, although they did not include any "best pricing" clause, and never objected to the terms of the contracts.
 
 VI
 
 63
 Tauber owes Salomon Forex the $26 million amount as a result of speculation on options and futures in foreign currencies. While Tauber claims his transactions with Salomon Forex are unenforceable because they did not comply with the CEA, the Treasury Amendment to the CEA, in exempting off-exchange transactions "in foreign currency," exempts off-exchange sales of options and futures in foreign exchange from CEA regulation. The trading between Salomon Forex and Tauber was off-exchange, involving individually negotiated deals between sophisticated traders, and was therefore excluded from CEA coverage by the Treasury Amendment. Tauber's argument that his trading with Salomon Forex was illegal under state law prohibiting bucket shops is equally ineffective because his trading involved legally enforceable futures and option contracts, not sham transactions. Finally, there is no bona fide dispute as to the amount of Tauber's indebtedness or the existence of any counterclaim to its enforcement. The judgment entered in favor of Salomon Forex is, therefore, affirmed.
 
 
 64
 AFFIRMED.
 
 
 
 [1]
 While Salomon Forex characterizes these transactions as forwards rather than futures, the district court declined to resolve the contracts' nature, noting that summary judgment is appropriate whether the contracts are futures or forwards. The difference between a forward and a future is discussed in Part II, below
 
 
 [2]
 In addition to transferring risk, futures trading increases consumers' knowledge of future price trends in a commodity by providing incentives to study and forecast its supply and demand. See United States v. Dial, 757 F.2d 163, 165 (7th Cir.), cert. denied, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985)
 
 
 [3]
 The Treasury letter goes on to express concern with regulation of markets in various other types of financial instruments, including, for example, installment loan contracts and futures trading in mortgages. Because such transactions are generally between large and sophisticated investors, the Treasury recommended that they also not be made to fall within the coverage of the CEA
 
 
 [4]
 The sole change Congress made in the amendment was that whereas the Treasury's version would have excluded from CEA regulation "puts and calls for securities," these were not excluded under the enacted version
 
 
 [5]
 While it has been Tauber's position before the district court and on appeal that his transactions were conducted off exchange, after an amicus brief suggested that Salomon Forex is a "board of trade" as used in 7 U.S.C. § 2, Tauber stated that he agreed. While we would be inclined to reject that position, we choose not to decide its validity since it was not argued before and decided by the district court
 
 
 [6]
 So in the original. "Traders" rather than "tellers" would seem to have been intended, from the context