**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**G7 ADVISORY SERVICES, LLC and Michael Geraud, Defendants.**

No. 05–80313–CIV.

United States District Court, S.D. Florida.

Dec. 6, 2005.

Allison Lurton, Rachel Entman, Jason Gizzarelli, Commodity Futures Trading Office, Division of Enforcement, Washington, DC, for Plaintiff.

Robert Lawrence Bonner, Homer & Bonner, Francisco Oscar Sanchez, Homer Bonner & Delgado, Miami, FL, for Defendants.

### ORDER DENYING DEFENDANTS' MOTION TO DISMISS

DIMITROULEAS, District Judge.

THIS CAUSE is before the Court on Defendants' May 19, 2005 Motion to Dismiss [DE–22]. The Court has carefully considered Plaintiff's June 27, 2005 Memorandum in Opposition [DE–28] and Defendants' July 15, 2005 Reply [DE–32] and is otherwise fully advised in the premises.

### I.  BACKGROUND

The Commodities Futures Trading Commission (CFTC) brought this action on April 12, 2005, for injunctive relief and

civil penalties pursuant to the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. § 6c(b),[1] and 17 C.F.R. § 32.9(a) and (c).[2] The CFTC also seeks restitution to customers for losses proximately cause by Defendants' alleged fraud, as well as disgorgement of Defendants' allegedly ill-gotten gains.

On April 12, 2005, the Court entered an Ex Parte Restraining Order ("SRO") freezing Defendants' assets and permitting early discovery. [DE–9].

On May 19, 2005, Defendants filed a Motion to Dismiss on the grounds that the CFTC lacked regulatory power over off-exchange foreign currency transactions in which the counterparty is an "affiliated person" of a futures commission merchants ("FCMS").[3] Here, Defendants allege that Safeguard FX, the counterparty to these transactions, was an affiliated person of a registered FCM that made and kept records of Safeguard FX in accordance with the law. 7 U.S.C. § 6f(c)(2)(B).

## II. DISCUSSION [4]

### A. Motion to Dismiss

### 1. Legal Standard on Motions to Dismiss for Lack of Subject Matter Jurisdiction

■ The CFTC bears the burden of demonstrating that this matter is within this Court's subject matter jurisdiction. *See Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir.1994)(party invoking jurisdiction bears burden of producing necessary facts to establish subject matter jurisdiction). This Court must dismiss a case upon determining that it lacks subject matter jurisdiction, regardless of how far the case has progressed. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir.2001)("[A] court must zealously insure that jurisdiction exists over a case, and should itself

---

1. 7 U.S.C. § 6c(b) provides that

   [n]o person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe. Any such order, rule, or regulation may be made only after notice and opportunity for hearing, and the Commission may set different terms and conditions for different markets.

2. 17 C.F.R. § 32.9(a) and (c) provide as follows:

   It shall be unlawful for any person directly or indirectly:

   (a) To cheat or defraud or attempt to cheat or defraud any other person;

   *   *   *   *   *   *

   (c) To deceive or attempt to deceive any other person by any means whatsoever; in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.

3. An FCM is defined in 7 U.S.C. § 1a(20) as

   an individual, association, partnership, corporation, or trust that—

   (A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and

   (B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

4. The Court has heavily relied upon Judge Ryskamp's excellent opinion in *CFTC v. Next Financial Services, Ltd.*, No.04–80562–CIV, Comm. Fut. L. Rep. P 29788 (S.D.Fla.2005).

raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises."); *Wascura v. Carver*, 169 F.3d 683, 685 (11th Cir.1999)("If a district court lacks subject matter jurisdiction over a claim ... it necessarily follows that the claim states no violation of federal law").

■■■ Rule 12(b)(1) of the Federal Rules of Civil Procedure indicates that attacks on this Court's subject matter jurisdiction may be either facial or factual. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir.1990). Facial attacks challenge subject matter jurisdiction based on the allegations in the complaint. *Id.* at 1529. When courts review facial attacks on their subject matter jurisdiction, they must take the allegations of the complaint at face value and ascertain whether they adequately allege subject matter jurisdiction. *Lawrence*, 919 F.2d at 1529. Factual attacks challenge subject matter jurisdiction as a matter of fact. *Id.* When adjudicating factual attacks on its subject matter jurisdiction, the Court may look at materials from outside the four corners of the complaint insofar as they relate to jurisdictional questions. *Id.* In a factual review, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

■■■ Some factual attacks on federal court jurisdiction involve facts that are also determinative of the merits of the action. *See id.* at 1528–30 (whether U.S. border patrol agent was within the scope of his duties at time of accident giving rise to federal tort claim controlled both juris-

dictional and liability questions); *Garcia v. Copenhaver, Bell & Assocs., M.D.'s P.A.*, 104 F.3d 1256, 1266 (11th Cir.1997)(whether ADEA defendant was an "employer" under the statute controlled whether statute governed the dispute and whether plaintiff stated a claim). When a motion to dismiss implicates both jurisdictional and actual facts, the court should treat the motion "as a direct attack on the merits" and proceed under either Rule 12(b)(6), which requires it to take the complaint at face value, or Rule 56, which allows it to rule on the merits. *Lawrence*, 919 F.2d at 1529 (quoting *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)).[5]

Attempting to obtain the protections of Rule 12(b)(6), the CFTC claims that Defendants' challenge to this Court's subject matter jurisdiction "directly implicate[s] the merits of [its] cause of action." The CFTC fails to explain, and the Court cannot discern, how this action involves intermingling of jurisdictional and actual facts: at issue is whether the CEA allows regulation of Defendants, not whether Defendants engaged in fraud. Whereas Defendants have introduced materials from outside the Amended Complaint in support of their motion to dismiss, the Court will review the motion as a factual attack brought pursuant to Rule 12(b)(1). Fed.R.Civ.P. 12(b)(1).

2. Legislative History of the CEA

a. Development of Futures Market Regulation

■■■ Futures trading contemplates the future delivery of goods for a price fixed at the time of contracting. *See Merrill*

---

**5.** Decisions of the Fifth Circuit entered prior to the close of business on September 30, 1981 are binding in the Eleventh Circuit. *See*

*Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

*Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 357–58, 102 S.Ct. 1825, 1828–29, 72 L.Ed.2d 182 (1982)(discussing the history and development of futures trading in U.S. agricultural markets). Futures trading was free from federal regulation until 1921's *Future Trading Act,* which taxed certain grain futures transactions not completed on contract market exchanges. *See id.* at 360–61, 102 S.Ct. at 1830. The Supreme Court invalidated the Future Trading Act the same year as an unconstitutional exercise of the taxing power. *Id.* at 361, 102 S.Ct. at 1830. The next year, Congress used its commerce power to re-enact the regulatory provision of the Futures Trading Act, renaming the new statute the Grain Futures Act of 1922. *Id.* The Grain Futures Act required governors of designated exchanges to "prevent its members from disseminating misleading market information and prevent the 'manipulation of prices or the cornering of grain by the dealers or operators upon such board.'" *Id.* at 361, 102 S.Ct. at 1831 (citing 42 Stat. 1000 (1922)(codified as amended at 7 U.S.C. § 7(3)(4))).

Congress amended the Grain Futures Act in 1936, renaming it the Commodities Exchange Act and expanding it to include several other agricultural commodities. *Merrill Lynch,* 456 U.S. at 360, 102 S.Ct. at 1830 n. 12. The CEA also made it illegal to "cheat or defraud," "willfully to make or cause to be made ... any false report or statement ... or false record," or "willfully to deceive or attempt to deceive ... by any means whatsoever" in connection with orders or contracts. *CFTC v. Baragosh* 278 F.3d 319, 323 (4th Cir.2002) *cert. denied,* 537 U.S. 950, 123 S.Ct. 415, 154 L.Ed.2d 296 (2002)(citing 49 Stat. 1493 (1936)(codified as amended at 7 U.S.C. § 6b(a)(I-iii))).

b. The Treasury Amendment

The 1974 Treasury Amendment to the CEA created the CFTC, granting it the power to investigate complaints, permit administrative hearings, order reparations, "seek injunctive relief, ... alter or supplement a contract's market rules, and ... direct a contract market to take whatever action deemed necessary by the Commission in an emergency." *Merrill Lynch,* 456 U.S. at 365–66, 102 S.Ct. at 1833 (citations omitted). Congress also broadened the scope of the CEA to include trading in foreign currency, which had thus far been wholly unregulated. During the pendency of the Amendment, the Treasury Department became concerned that all-encompassing regulation of foreign commodities transactions was unwarranted. Treasury explained its position in a letter to the Senate:

> The Department feels strongly that foreign currency futures trading, other than on organized exchanges, should not be regulated by the Commodities Futures Trading Commission. Virtually all trading in foreign currencies in the United States is carried on through an informal network of banks and dealers. This dealer market, which consists primarily of the large banks, has proved highly efficient in serving the needs of international business in hedging the risks that stem from foreign exchange rate movements. The participants in this market are sophisticated and informed institutions, unlike the participants on organized exchanges, which, in some cases, include individuals and small traders who may need to be protected by some form of governmental regulation .... The Commodities Futures Trading Commission would clearly not have the expertise to regulate a complex banking function and would confuse an already highly regulated business sector. Moreover, in this context, new regulato-

ry limitations and restrictions could have an adverse impact on the usefulness and efficiency of foreign exchange markets for traders and investors.

s. REP. No. 93–1131 (1974), *reprinted in* 1974 U.S.C.C.A.N. at 5887–88. Treasury suggested that the amendment's application be confined to "futures trading in foreign currencies ... other than on organized exchanges." *Id.* at 5889. The Senate adopted Treasury's suggestion, explaining in its report that the amendment only applied to foreign currency trading insofar as "such trading is conducted on a formally organized futures exchange," and that "regulation by the Commission of transactions ... which generally are between banks and other sophisticated institutional participants, is unnecessary, unless executed on a formally organized futures exchange." *Id.* at 5863–64. The conference report likewise explains that the amendment "provides that interbank trading of foreign currencies ... is not subject to Commission regulation." H.R. CONF. REP. NO. 93–1383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897. The actual amendment exempts from CFTC jurisdiction "transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade." 88 Stat. 1395, 7 U.S.C. § 2(ii), *amended by* 7 U.S.C. § 2(c).

At the time of the Treasury Amendment's enactment, the CEA defined "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity ...." Courts found this definition inherently ambiguous, as "[a]lmost all transactions in futures contracts could be characterized as occurring on a 'board of trade' involving 'informal associations of people engaged in the business of buying and selling commodities." *CFTC v. Frankwell*

*Bullion Ltd.,* 99 F.3d 299, 302 (9th Cir.1996)(quoting *CFTC v. Standard Forex, Inc.,* No. CV–93–0088 (CPS), 1993 WL 809966 at *8 (E.D.N.Y. Aug.9, 1993)). Turning to the legislative history cited herein, the majority of courts interpreting this language have concluded that the Treasury Amendment exempted only interbank transactions in foreign currency from CFTC regulation. *See Standard Forex,* 1993 WL 809966 at *9–10; *Rosner v. Peregrine Finance Ltd.,* No 95–Civ. 10904(KTD) 1998 WL 249197 at *5 (S.D.N.Y., May 20, 1998); *Lehman Bros. Comm. Corp. v. Minmetals Intern. Non-Ferrous Metals Trading Co.,* 179 F.Supp.2d 118, 156–57 (S.D.N.Y.2000); *Baragosh,* 278 F.3d at 330 (relying on 2000's Commodities Futures Modernization Act's ("CFMA") protection of eligible contract participants as additional evidence of Congressional preference for regulation of off-exchange foreign currency transactions involving retail investors).

While several courts have concluded that the Treasury Amendment exempts all off-exchange foreign currency transactions from CFTC regulation, the Court does not find these decisions persuasive. In *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 969–70 (4th Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994) a sophisticated individual investor with an estimated net worth of more than one-half billion dollars sought to avoid a trading debt on the grounds that the trades were contrary to the CEA. *Id.* at 976–77. The investor claimed in part that the Treasury Amendment's exemption applied because the trades were off-exchange and because he engaged in them as an individual rather than a banking institution. *Id.* The Fourth Circuit disagreed, reasoning that "the nature of the trade (whether a standardized trade within an organized market or an individually negoti-

ated private deal), not the corporate form of the trader, ... determines whether a trade is within the Act." *Id.* at 977. *Tauber* did not hold that all off-exchange transactions were exempt from CFTC regulation, however, "only that individually-negotiated foreign currency traders" were exempt. *Tauber,* 8 F.3d at 978. Such is not the case here, as the CFTC has alleged that most, if not all, of the individual investors were non-eligible contract participants. *Frankwell Bullion* also concluded that the Treasury Amendment exempted all foreign currency transactions from CFTC regulation, but did so without considering the conference report as evidence of Congressional intent in passing the amendment. *See Frankwell Bullion,* 99 F.3d at 302–03; *Baragosh,* 278 F.3d at 327. *Kwiatkowski v. Bear Stearns Co.,* No, 96 CIV. 4798(JGK), 1997 WL 538819 at *10 (S.D.N.Y. Aug. 29, 1997), reached the same conclusion, but based on a misreading of *Dunn v. CFTC,* 519 U.S. 465, 470–71, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), in which the Supreme Court held that off-exchange purchases and sales of foreign currency options were "transactions in foreign currency." *Dunn* did not address the question of whether the transactions were conducted on an organized exchange.

### c. The Commodities Futures Modernization Act of 2000

Congress enacted Commodities Futures Modernization Act of 2000 ("CFMA"), the most recent amendment to the CEA, "to clarify the jurisdiction of the [CFTC] over certain retail foreign exchange transactions." The CFMA excluded from CFTC regulation "financial derivatives contracts traded off exchange by eligible contract participants." H.R. REP. NO. 016–711(III) (2000), 2000 WL 1279131, at *47. The CFMA grants the CFTC jurisdiction over all off-exchange foreign currency transactions involving non-eligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii). The CFMA's listing of specified unregulated entities eliminated the need for judicial interpretation of the term "board of trade," which the CFMA redefined as "any organized exchange or other trading facility." 7 U.S.C. § 1a(2).

### 3. Application of the CFMA

7 U.S.C. § 2(c)(2)(B) provides for CFTC regulation of off-exchange foreign currency transactions offered to non-eligible contract participants. Yet transactions offered to non-eligible contract participants are still exempt from CFTC regulation if the counterparty thereto is an entity enumerated in § 2(c)(2)(B)(ii). As the statute provides,

the Commission shall have jurisdiction over, an agreement, contract, or transactions in foreign currency that—

(I) is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option (other than an option executed or traded on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 [15 U.S.C. 78(a) ] ); and

(ii) is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is—

(I) a financial institution;

(II) a broker or dealer registered under section 15(b) or 15C of the Securities Exchange Act of 1934 [15 U.S.C. 78(a) ] or a futures commission merchant registered under this chapter;

(III) an associated person of a broker or dealer registered under section 15(b) or 15C of the Securities Exchange Act of

1934 (15 U.S.C. 78o(b), 78o–5), or an affiliated person of a futures commission merchant registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under section 15C(b) of 17(h) of the Securities Exchange Act of 1934 (15 U.S.C. 78o–5(b), 78q(h) or section 6f(c)(2)(B) of this title); (IV) an insurance company described in section 1a(12)(A)(ii) of this title, or a regulated subsidiary or affiliate of such an insurance company; (V) a financial holding company (as defined in [section 184] of Title 12); or (VI) an investment bank holding company (as defined in section 17(1) or the Securities Exchange Act of 1934 [15 U.S.C. 78q(1) ]). (C) Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to sections 6b, 6c(b), 15 and 13b ... 13a–1, 13a–2, and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

7 U.S.C. § 2(c)(2).

Defendants have moved to dismiss on the grounds that Safeguard FX is an "affiliated person of a futures commission merchant (FCM) registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under ... section 6f(c)(2)(B)." Application of this exemption hinges on whether Safeguard FX is an affiliate of a registered FCM and whether the FCM is required to keep records pursuant to § 6f(c)(2)(B).

Defendants claim that Safeguard FX is an affiliated person of an FCM. An affiliated person is "any person directly or indirectly controlling, controlled by, or under common control with a futures commission merchant ...." 7 U.S.C. § 6f(c)(1)(I).

CFTC contends that it has jurisdiction over these transactions because the FCM is not required to keep records pursuant to § 6f(c)(2)(B). Section 6f(c)(2)(A)-(B) provides as follows:

(A) Each registered futures commission merchant shall obtain such information and make and keep such records as the Commission, by rule or regulation, prescribes concerning the registered futures commission merchant's policies, procedures, or systems for monitoring and controlling financial and operational risks to it resulting from the activities of any of its affiliated persons, other than a natural person.

(B) The records *required* under subparagraph (A) shall describe, in the aggregate, each of the futures and other financial activities conducted by, and the customary sources of capital and funding of, those of its affiliated persons whose business activities are reasonably likely to have a material impact on the financial or operational condition of the futures commission merchant, including its adjusted net capital, its liquidity, or its ability to conduct or finance its operations.

7 U.S.C. § 6f(c)(2)(A)-(B)(Emphasis added.)

The CFTC relies on the language of § 6f(c)(2)(B), "the records required under subparagraph (A)", for the proposition that § 2(c)(2)(B)(ii)(III) only applies to FCMs required to keep § 6f(c)(2)(A) records. The record keeping requirement only applies to FCM's possessing sufficient assets. Specifically, 17 C.F.R. §§ 1.14(d) and 1.15(c)(1) provide that "any futures commission merchant which holds funds or property of or for futures customers of

less than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission merchant's fiscal year-end" is exempt from record keeping requirements. The CFTC contends that the FCM entity does not possess sufficient funds to be subject to the record keeping requirements. Defendants assert that the language of § 2(c)(2)(B)(ii)(III) applies to all entities that keep records, whether they are required to do so or not. The Court declines to adopt Defendant's interpretation, as it would allow registered FCMs to avoid CFTC regulation based on personal preference. Any registered FCM could skirt CFTC regulation merely by electing to keep records, thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation.

### 4. Applicability of CEA Regulations

■ The Complaint alleges a single count of action for violation of both 7 U.S.C. § 6c(b) and regulation 17 C.F.R. § 32.9(a) and (c), which bars fraud in connection with commodity options transactions. Defendants make two arguments in support of their position that the CFTC has failed to state a claim for alleged violation of § 32.9. First, Defendants claim that § 32.9, which was promulgated in 1976, has never applied to foreign currency transactions. This argument rests on Defendants' view that the Treasury Amendment excluded all transactions in foreign currency from CFTC regulation. According to Defendants, since the CFTC promulgated the regulation during the effective period of the Treasury Amendment, and since Congress did not amend the regulation in the CFMA, the regulation does not now apply to foreign currency transactions.

The Court is persuaded that the CFMA's leaving § 32.9 unaltered is evidence of Congressional intent that the regulation be applied as it was under the Treasury Amendment. Courts assume that "Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 326, 112 L.Ed.2d 275 (1990)(citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979)). This knowledge extends to judicial title proscribing fraud in connection with commodity option transactions to the extent the agreement, contact, or transaction would otherwise be subject to such sections and regulations. In contrast, while § 2(c)(2)(C) states that transactions not described in § 2(c)(2)(B) are subject to § 6c(b), § 2(c)(2)(C) does not state that such transactions are subject to specific regulations promulgated pursuant to § 6c(b). Defendants take § 2(c)'s failure to name selected regulations as evidence that § 32.9 does not apply to off-exchange foreign currency transactions.

Defendants' argument is based on the flawed premise that § 6c(b) is merely an enabling statute allowing the CFTC to promulgate appropriate regulations "after notice and opportunity for hearing." While § 6c(b) is an enabling statute, it also prohibits conduct in violation of existing CFTC regulations: "No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter ... contrary to any rule, regulation or order of the Commission prohibiting any such transaction ...." Section 32.9 was in effect prior to the enactment of the CFMA, which left section § 32.9 unaltered. Whereas Congress took no affirmative act to deprive § 32.9 of effect insofar as it relates to off-exchange foreign currency transactions, § 32.9 governs Defendant's conduct. *See Florida Nat. Guard v. Fed. Labor Relations Auth.*, 699 F.2d 1082, 1087; *see also U.S. v. Langley,*

62 F.3d 602, 605 (4th Cir.1995) *cert. denied,* 516 U.S. 1083, 116 S.Ct. 797, 133 L.Ed.2d 745 (1996). ("[I]t is proper to consider that Congress acts with knowledge of existing law, and that absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction.")(quotations omitted). Depriving § 32.9 of effect would be contrary to the CFMA's purpose of clarifying, not revoking, the CFTC's authority to regulate off-exchange foreign currency transactions.

Defendants' claim of insufficient notice that their alleged conduct violated § 32.9 is belied by numerous similar actions the CFTC has brought against unregistered FCM's. That these actions have largely terminated in default or consent judgments does not diminish their utility as a means of notification that the CFTC actively enforces the CEA and its attendant regulations against entities not enumerated in § 2(c)(2)(B)(ii).

Wherefore, Defendants' Motion to Dismiss [DE-22] is hereby **DENIED.**